UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------x
UNITED STATES OF AMERICA

                 -against-

HAMAD ALI,
HAMOOD ZOKARI,
ISADORE A. USEROWITZ,
HAROLD WEISBERG and
MOHSEN HUDYIH,

                                 Defendants.   x
----------------------------------------------------------------

MEMORANDUM OPINION

06-CR-200 (ENV)

**VITALIANO, D.J.**

Named in an indictment with an even larger cast of co-defendants, Hamad Ali, Hamood Zokari, Isadore Userowitz, Harold Weisberg and Mohsen Hudyih were the first to go to trial on charges of operating, and conspiring to operate, an unlicensed money transmitting business and the evasion of, and conspiracy to evade, monetary instrument exportation reporting requirements.[1] Both sides had moved in limine and/or during trial either to exclude or admit by category certain types of monetary instruments. See United States v. Ali, --- F.Supp.2d ---, 2008 WL 682594 (E.D.N.Y. March 7, 2008) (fully completed checks drawn to the benefit of an intended payee inadmissible to prove conspiracy to evade monetary reporting requirements). After oral argument and extended briefing, the Court determined that checks made out to a payee who was a real person, and ultimately endorsed by or paid to someone other than that named payee, were admissible for the purpose of proving the unlicensed money transmitting business charges, but were inadmissible for the purpose of proving the monetary reporting evasion

---

[1] Defendant Hamood Zokari was convicted of evading, and conspiring to evade, the monetary reporting requirements, but acquitted by the jury of the money transmitting business-related charges. The other round one defendants were acquitted of all charges.

1

charges. The Court informed the parties that this Memorandum Opinion, supplementing and explaining the ruling, would follow.

## BACKGROUND

Rendered in broad strokes, the scheme the government alleges here is less complicated than the sprawling multi-party indictment might suggest. The indictment charges defendants, those tried and those yet to be tried, with sending and conspiring to send sums of money to Yemen in the course of running an alleged money transmitting business on behalf of customers in America. It is further alleged that defendants did so without the license required by state law, thereby violating federal law, and without filing outbound currency transportation reports, a separate and independent violation of federal law. Each species of crime carries its own evidentiary implications.

Section 1960 of Title 18 makes it a federal crime to operate a money transmission business without a license where one is required by state law. In this case, New York law determines whether defendants were required to have a money transmission license in order to transmit funds to Yemen. In New York, "no person shall engage in the business of selling or issuing checks, or engage in the business of receiving money for transmission or transmitting the same, without a license therefor obtained from the superintendent [of banking] as provided in this article...." N.Y. Banking Law § 641 (McKinney 1999). The indictment charged each defendant with one count of operating or aiding and abetting another in the operation of an unlicensed money transmitting business and another of conspiracy to operate such a business. Not unexpectedly, the government had a collection of monetary instruments to offer as proof of this species of charged offense.

The second species of offense charged was violation of the outbound currency reporting

requirements. Under 31 U.S.C. 5316(a)(1), persons who transport cash or certain kinds of monetary instruments of more than $10,000 from a place inside the United States to a place outside the United States are required to fill out a form listing, among other things, the amount and kind of monetary instruments being transported, their owner and their destination. "Monetary instruments" are defined by the applicable regulation to include the following:

> (i) Currency;
> (ii) Traveler's checks in any form;
> (iii) All negotiable instruments (including personal checks, business checks, official bank checks, cashier's checks, third-party checks, promissory notes (as that term is defined in the Uniform Commercial Code), and money orders) that are either in bearer form, endorsed without restriction, *made out to a fictitious payee* (for the purposes of § 103.23), or otherwise in such form that title thereto passes upon delivery;
> (iv) Incomplete instruments (including personal checks, business checks, official bank checks, cashier's checks, third-party checks, promissory notes (as that term is defined in the Uniform Commercial Code), and money orders) signed but with the payee's name omitted; and
> (v) Securities or stock in bearer form or otherwise in such form that title thereto passes upon delivery.

31 C.F.R. § 103.11(u)(1) (emphasis added). The defendants were each charged with evading the reporting requirements -- either by failing to file a required report, filing a misleading report or structuring transactions to circumvent the reporting requirements[2] -- and conspiring to do so. The government had a wad of checks to offer on this species of offense, too; indeed, all of the checks it sought to offer on the first species. Among this collection were completed checks made out to a specific named payee, but a payee whom the government contended was "fictitious". It was the proffer of this subset of checks that precipitated the Court's split decision

---

[2] Under 31 U.S.C. 5324(c), it is illegal to structure transactions in order to evade the monetary requirements. The statutory definition of structuring includes, but is not limited to, the practice of breaking down a single sum of currency exceeding $10,000 into smaller sums, including sums at or below $10,000, or the conduct of a transaction, or series of currency transactions, including transactions at or below $10,000. The transaction or transactions need not exceed the $10,000 reporting threshold at any single financial institution on any single day in order to constitute structuring within the meaning of the statute.

on admissibility.

## DISCUSSION

I. <u>Checks Offered to Prove Operations of a Money Transmitting Business</u>

Defendant Ali, accused as the principal operator of an alleged money transmitting business, argued that the word "money" as used in the New York licensing statute referred only to cash and did not cover transmissions initiated by a check or a non-currency monetary instrument. Under this interpretation, the checks transported to Yemen that were proffered by the government would be inadmissible to prove money transmitting absent a showing that a customer of Ali's alleged business gave cash to Ali which he, in turn, converted into checks sent to Yemen.

On their face, neither the federal nor the state money transmitting statute delineates a zone of prohibited conduct with much clarity. Neither statute, for example, provides a precise definition of what constitutes the operation of a "business".[3] More surprisingly from a drafting perspective, and more pertinent to Ali's objection, both the federal statute and the entirety of New York's Banking Law lack a definition for the term "money".[4] Unfortunately for Ali, the

---

[3] The Court of Appeals for the Second Circuit has hewn flesh to the bone, defining a money transmitting business for the purposes of 18 U.S.C. § 1960 as one that

> receives money from a customer and then, for a fee paid by the customer, transmits that money to a recipient in a place that the customer designates, usually a foreign country. After the customer gives the money transmitter an amount to send to the designee, the transmitter notifies the "payer" with whom it has a contractual arrangement in the recipient country. The payer then notifies the designated recipient of the money, and pays the money to the designee at the payer's office. The transmitter then remits to the payer the amount paid to the designee, plus the payer's commission.

United States v. Velastagui, 199 F.3d 590, 592 (2d. Cir. 1999).

[4] The <u>Valestegui</u> court further clarified that the statute does not apply to "an isolated instance of improper transmittal of money." Velastagui, 199 F.3d at 595 n. 4. It is for this reason that

4

applicable definition of "check" is far less ambiguous. New York's Banking Law defines "check" for the purposes of §641 as "any check, draft, traveler's check, money order or other instrument *for the transmission or payment of money.*" N.Y. Banking Law § 640 (McKinney 1999) (emphasis added). Stated differently, New York law specifically recognizes a check as a money transmitting vehicle. The notion that the money transmitting statute only refers to cash is directly at odds with the statutory essence of a "check" created by the same Banking Law.

Further, Ali provided no statutory or decisional authority for a cash-only interpretation of the term "money" as used in the statute. Ali merely referred to United States v. Elfgeeh, 515 F.3d 100 (2d Cir. 2008), in which cash rather than checks were allegedly the chief vehicle of transportation for the money transmission business at issue. (Ali Mar. 8, 2008 Ltr. at 2 (citing Kelly Moore, *The War of Federal Criminal Prosecutions in the War on Terror*, 11 LEWIS & CLARK L. REV. 837, 843 (2007))). Of course, that the scheme implicated in the Elfgeeh case was not identical in all respects to this one was not controlling in determining the definition of "money". Ali certainly offered no reason why the specific facts of Elfgeeh should define the outer limit of the money transmitting statute, and the Court could perceive of none.

For the foregoing reasons, and those stated on the record at the time, Ali's motion to exclude checks as evidence on the money transmission counts absent proof they were issued in exchange for currency was denied.

II. "Fictitious Payee" Checks Offered to Prove Reporting Requirement Counts

As to the evasion charges, defendants also sought to exclude checks drawn to the order of individuals other than the individuals intended, ultimately, to receive the proceeds of the check in

---

charges of operating an unlicensed money transmitting business have survived motions to dismiss founded in due process concerns related to the lack of a definition of "money." See, e.g., United States v. Elfgeeh, No. CR-03-0133 (CPS), 2004 WL 3767299, at *7-*8 (E.D.N.Y. 2004).

5

Yemen. The government sought to introduce them as "checks made out to a fictitious payee" and thus subject to outbound currency reporting requirements pursuant to 31 C.F.R. § 103.11(u)(1).

A. The Fictitious Payee Rule

The "fictitious payee rule" has long bedeviled negotiable instrument litigation. The most recent incarnation of this rule in the Uniform Commercial Code provides in § 3-404(b): "If... a person whose intent determines to whom an instrument is payable... does not intend the person identified as payee to have any interest in the instrument, or... the person identified as payee of an instrument is a fictitious person... Any person in possession of the instrument is its holder... [and] [a]n indorsement by any person in the name of the payee stated in the instrument is effective as the indorsement of the payee in favor of a person who, in good faith, pays the instrument or takes it for value or for collection." The policy behind this version of the fictitious payee rule seeks to ensure that, in such cases, "the loss should be placed on the drawer of the check, rather than on the drawee or the depositary bank that took the check for collection" because the drawer is in the best position to avoid the fraud that usually sets in motion such fictitious payee scenarios. Richard A. Lord, WILLISTON ON CONTRACTS § 60:35, at 597-98 (4th ed. 2002). At essence, this section of the Uniform Commercial Code treats an instrument that appears not to be a bearer instrument as a matter of form *like* a bearer instrument as a matter of law.

There is no question that with this version of the fictitious payee rule, the determining factor in its application is not whether the payee is, on the one hand, a fictitious person or, on the other, a real payee but one whom the person whose intent is determinative does not intend to have an interest in the instrument. The U.C.C.'s "fictitious payee rule" draws no distinction between the two. See, e.g., Perini Corp. v. First Nat. Bank of Habersham County, Ga., 553

F.2d. 398, 409 n. 14 ("Th[e] situation is the same whether agent employs a fictitious payee or a real payee he intends to have nothing to do with the check."); McAdam v. Dean Witter Reynolds Inc., 896 F.2d 750, 759 (3d Cir. 1990) (fictitious payee rule applies where "when an employee, intending the payee to have no interest in the instrument, causes his employer to draw a check made payable to a customer of the employer"). But, neither the criminal statute nor the implementing regulation defines "fictitious payee". Statutory silence, therefore, forced a critical threshold analysis: What does the regulation mean when it uses the term "fictitious payee"? Is it a reference to the rule proposed by the Uniform Law commissioners or, perhaps, just to that portion of it which refers to a check drawn to a "fictitious person"? But if it is, since the crime allegedly occurred there, what of the New York version of the Uniform Commercial Code which makes no reference at all to "fictitious payees" or to a check drawn to a "fictitious person"?

B. Statutory Interpretation

The list of "monetary instruments" subject to the reporting statute includes "all negotiable instruments (including personal checks, business checks, official bank checks, cashier's checks, third-party checks, promissory notes (as that term is defined in the Uniform Commercial Code), and money orders) that are either in bearer form, endorsed without restriction, *made out to a fictitious payee* (for the purposes of § 103.23), or otherwise in such form that title thereto passes upon delivery[.]" 31 C.F.R. § 103.11(u)(1)(iii) (emphasis added). It is from this port that the analysis is launched.

a. Plain Language

It is elementary that interpretation begins with an examination of the language of the statute or regulation itself; where it is unambiguous, the interpretive process also ends there. See Puello v. Bureau of Citizenship and Immigration Services, 511 F.3d 324, 327 (2d Cir. 2007) (citing Collazos v. United States, 368 F.3d 190, 196 (2d Cir. 2004)). The process of ascertaining

7

the "plain meaning" of a statute or regulation includes an analysis of the particular language at issue, as well as the language and design of the statute or regulation as a whole. Id. The government contends that there is no ambiguity, and that the plain meaning of the term "fictitious payee" can only be taken from its use in the context of the law of commercial paper, restated for proposed codification in the Uniform Commercial Code, as it is a "term of art". See Williams v. Wilmington Trust Co., 345 F.3d 128, 133 (2d Cir. 2003) ("When Congress uses in a statute a term of art with a long history of judicial interpretation, we must presume that Congress intends to use the word in its technical sense.").

Where there is nothing to suggest that the drafters meant to use a given phrase as a term of art, the divergence between its plain meaning and its use as a "term of art" takes on greater importance. See F.D.I.C. v. Meyer, 510 U.S. 471, 476, 114 S.Ct. 996 (1994); see also Federal Exp. Corp. v. Holowecki, 128 S. Ct. 1147 (2008) (Thomas, J. dissenting) ("Because there is nothing to suggest that Congress used 'charge' as a term of art, we must construe it 'in accordance with its ordinary or natural meaning.'"). Significantly, there is nothing whatsoever in the reporting statute or implementing regulations to suggest that Congress or the Treasury Department meant to use "fictitious payee" as a commercial paper term of art. If anything, basic principles of statutory interpretation compel the exact opposite conclusion.

Specifically, the implementing regulation for the reporting statute does make reference to the Uniform Commercial Code's restatement of the law of commercial paper to supply a definition, but it does so only with reference to an even more commonly understood term – "promissory notes". See 31 C.F.R. § 103.11(u)(1)(iii). No similar parenthetical qualification referencing any U.C.C. language adjoins the use of "fictitious payee" within the regulation. Under the rule of the last antecedent, "a limiting clause or phrase ... should ordinarily be read as modifying only the noun or phrase that it immediately follows." United States v. Kerley, 416

F.3d 176, 180 (2d Cir. 2005); Barnhart v. Thomas, 540 U.S. 20, 26, 124 S. Ct. 376 (2003).

Applying this established rule, the Court read the phrase "as that term is defined in the Uniform Commercial Code" to modify only the term "promissory notes." The related ancient canon of negative implication, *inclusio unius est exclusio alterius*, further moved the Court to interpret this language as restricting the U.C.C. reference solely to the promissory note clause. Qi Hang Guo v. United States Dep't of Justice, 422 F.3d 61, 64 (2d Cir. 2005) (quoting *Black's Law Dictionary* 1635 (7th ed. 1999).[5] Bluntly, the language used in the regulation made transparent its intent to signal expressly when it was intended to use as a "term of art" a commercial law definition restated in the Uniform Commercial Code.[6]

---

[5] The Court recognizes that the canon is not universally applicable, and that it has force "only when the items expressed are members of an 'associated group or series,' justifying the inference that items not mentioned were excluded by deliberate choice, not inadvertence." Barnhart v. Peabody Coal Co., 537 U.S. 149, 123 S.Ct. 748 (2003). Here, the grouping of those instruments that are "monetary instruments" for the purposes of the reporting statute is abundantly clear, and the justification evident.

[6] Though it is rendered moot by the plain language stage of the Court's inquiry, the government's argument concerning the legislative history of 31 C.F.R. § 103.11 deserves attention. The government argued that, with the introduction of the term "fictitious payee" to the regulation and with every added term since 1987, the Treasury Department added references to "the UCC definition of that term," with accompanying history indicating that "[o]ther definitions referring to transactions by nonbank financial institutions would be added, and these are intended to parallel the equivalent definitions in [the] U.C.C." Mar. 16, 2008 Gov't Ltr. Br. at 2 (citations omitted). Closer scrutiny reveals, even amplifies, the same problems that compelled the Court's ruling on the face of the regulation. To the extent that the any language in the regulation refers readers to the U.C.C. for the definition of any "specific term", that term is limited to "promissory note". See, e.g., 52 FR 11436, 11437 (April 8, 1987) ("The term "promissory note" refers to the UCC definition of that term."). Subsequent updates do not include "fictitious payee" or refer to sections of the Code other than Article 3. See, e.g., 60 FR 220, 221 (January 3, 1995) ("The proposed rule added new definitions to the existing definitions in the Treasury rules. A number of these new definitions applicable to banks were identical to the terms used in Uniform Commercial Code Article 4A (UCC 4A) (e.g., originator, originator's bank, payment order, and others). In addition, the proposed rule added a number of new definitions applicable to transactions by nonbank financial institutions. These definitions were intended to parallel the equivalent definitions in UCC 4A (e.g., transmittor, transmittor's financial institution, transmittal order, and others)."). The government did not present, nor was the Court able to discern on its own, any language within the regulation's history that suggested the slightest intent to define "fictitious payee" in accord with its use in Article 3 of the Uniform Commercial Code.

The Court, therefore, was obligated to move on to a "plain language" inquiry. In so doing, it was bound to rely on precisely that: the plain language of the regulation. The government argued, correctly, that the Court can derive a plain language definition from a specialized law dictionary. See United States v. Sabbeth, 262 F.3d 207, 217 (2001). However, its subsequent cite to Black's Law Dictionary in its March 16, 2008 letter brief for a general definition of "fictitious payee" was misguided. In fact, the definition in Black's was not of "fictitious payee" at all but the "fictitious payee *rule*":

> Fictitious-payee rule. *Commercial law*. The principle that if a drawer or maker issues commercial paper to a payee whom the drawer or maker does not actually intend to have any interest in the instrument, an ensuing forgery of the payee's name will be effective to pass good title to later transferees – Also termed *padded-payroll rule*.

BLACK'S LAW DICTIONARY 639 (7th ed.1999) (italics in original).[7] This is the definition of a specific rule of commercial paper, "a definite and predictable rule covering a carefully circumscribed set of cases," In re Lou Levy & Sons Fashions, Inc., 988 F.2d 311, 316 (2d Cir. 1993), rather than the term "fictitious payee" which, in the absence of clear direction from the drafters, may not be co-extensive with the full reach of the rule but fall only within a subset, i.e., relating to "fictitious persons", of the set of cases demarking the rule. In short, the reference begged the question; it did not answer it.

Furthermore, although Black's Law Dictionary recognized no commonly accepted definition for the term "fictitious payee" itself, searches for definition of the words used in the regulation beyond Black's proved more fruitful. The New Oxford American Dictionary, for example, defines "fictitious" as "not real or true, being imaginary or having been fabricated... Of, relating to, or denoting the imaginary characters and events found in fiction." THE NEW OXFORD AMERICAN DICTIONARY 627 (2001). Indeed, it is a definition universally recognized by

---

[7] The Eighth Edition of Black's Law Dictionary, similarly defines the fictitious payee rule rather than the specific term in issue. See BLACK'S LAW DICTIONARY 657 (8th ed. 2004).

10

American language dictionaries. Relying on this most common of tools for determining the meaning of language, the Court ruled that the term "fictitious" in the statute's implementing regulation referred to a payee who did not exist -- being imaginary or fabricated -- rather than being a payee who did exist but was not intended by the maker of the check to be its ultimate beneficiary. The Court found additional support for this definition of "fictitious payee" in United States v. Pastore, 537 F.2d 675 (2d Cir. 1976), which antedated the amendment to the implementing regulation adding "fictitious payee" to the litany of covered monetary instruments. In Pastore, the Second Circuit described checks made out to "fictitious payees" in a manner that explicitly distinguished them from the U.C.C. definition of the "fictitious payee" rule, that is, a check made out to a person who was not intended to have an interest in the instrument.[8]

For these reasons, the Court read the implementing regulation as requiring by its "fictitious payee" reference only the report of those checks made payable to a payee who did not, in fact, exist. Accordingly, as the government conceded, since none of the checks claimed by the government to be drawn to a fictitious payee was actually drawn to the order of someone who did not exist,[9] none of the checks in this category proffered by the government were admitted on the currency reporting counts.[10]

---

[8] "The Government's theory was that in 1971 the proceeds of a number of checks, drawn upon Ron-Ore or purchased by it, went to appellant. Seven of the checks were payable to 'Nick Galloni' or to cash, and were endorsed 'Nick Galloni.' At trial, Galoni... denied endorsing the checks or receiving the proceeds. Of the remaining checks, *all but one were payable to apparently fictitious payees, and the last was payable to a person who testified that he had no knowledge of the check.* Many of these checks were signed for Ron-Ore in the name of George Sedrick, *who was a fictitious person.*" Id. at 677 (emphasis added).

[9] Interestingly, though the checks the government claimed were drawn to payees whom the maker of the check intended to have no interest (and, therefore, fictitious payees), were first conditionally admitted even for reporting statute purposes, the government did not offer any direct evidence as to the maker's intent. For example, there was no testimony from Neil Kramer, the government's cooperating witness, who had issued a number of these checks, as to his intent in drawing the checks to the named payee.

[10] In accordance with the Court's earlier ruling, evidence inadmissible for proof of the

11

C. Rule of Lenity and Due Process Concerns

Even if the Court had embraced the government's argument that the words "fictitious payee," as used in the implementing regulation, were used as a "term of art" rooted in the Uniform Commercial Code, the same result—that is, ruling the proffered "fictitious payee" checks inadmissible on the evasion counts—would have obtained only for reasons relating to due process. Fundamental principles of constitutional fair warning mandate "that no individual be forced to speculate, at peril of indictment, whether his conduct is prohibited." Dunn v. United States, 442 U.S. 100, 112, 99 S.Ct. 2190, 2197, 60 L.Ed.2d 743 (1979). One manifestation of that principle, the rule of lenity, "ensures fair warning by so resolving ambiguity in a criminal statute as to apply it only to conduct clearly covered.... [A]lthough clarity at the requisite level may be supplied by judicial gloss on an otherwise uncertain statute, due process bars courts from applying a novel construction of a criminal statute to conduct that neither the statute nor any prior judicial decision has fairly disclosed to be within its scope. In each of these guises, the touchstone is whether the statute, either standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal." United States v. Lanier, 520 U.S. 259, 266, 117 S.Ct. 1219 (2005). Where such an ambiguity exists, the rule of lenity "requires that... a court should resolve [the] ambiguity in favor of the defendant." United States v. Polizzi, No. 06-CR-22 (JBW), 2008 WL 877164 at *62, (E.D.N.Y. Apr. 1, 2008).[11]

It is exceedingly difficult for the Court to imagine a traveler leaving the United States confronted with the language of the statute and its implementing regulation knowing, with any

---

substantive count of evasion of monetary requirements was also inadmissible for the related conspiracy count. See United States v. Ali, --- F.Supp.2d ---, No. 06-cr-200 (ENV), 2008 WL 682594 (E.D.N.Y. Mar. 7, 2008).

[11] Despite chatter to the contrary in certain academic circles, reports of the rule's demise have been greatly exaggerated. See, e.g., United States v. Santos, --- U.S. ---, 128 S.Ct. 2020 (2008) (applying rule of lenity to undefined term in federal money laundering statute); see also Note, *The New Rule of Lenity*, 119 HARV. L. REV. 2420, 2421 (2006) (though criticized in recent years, rule of lenity neither "defunct" nor "randomly applied").

12

degree of certainty, whether conduct of the variety at issue was allowed by law or not. First, accepting for purposes of argument the government's "term of art" interpretation in which the words "fictitious payee" used without definition or reference to any standard was meant to incorporate the restatement in the Uniform Commercial Code of an arcane principle of law, the inquiring traveler would discover an unhelpful diversity of information. New York's version of the rule, N.Y.U.C.C. § 3-405 (McKinney 2001), for example, uses neither the words "fictitious payee" nor "fictitious person" because of the confusion those words have caused and because the existence or nonexistence of the named payee is "not decisive" but rather "important only as it may bear on the intent" of the maker, who presumably was seeking to work a fraud at the paying bank's expense. N.Y.U.C.C. § 3-405 cmt. 1. More to the point, it is precisely because the words "fictitious payee" caused such confusion, that is, whether the rule should apply at all when the payee whom the check maker intended to have no interest was real and not imaginary, that led the Uniform Law Commissioners to propose its revision and led to New York's elimination of the words altogether. Id.

In this setting, the traveler would truly be set adrift at his criminal peril; the victim of the clash between the real world with its plain language and arcane legal protections accorded bankers through legal prestidigitation. The lack of clarity and the inconsistency in the statute and its regulations make the compliance choices facing the traveler all the more diabolical when it is understood that the face of a fictitious payee check is absolutely identical to the face of a completed and indisputably non-reportable check -- a named payee, completed payment amount and signed by the maker of the check. Specifically, a traveler might not have the slightest understanding of the check maker's intent with respect to the named payee's interest in a check, but might know to a metaphysical certainty that the named payee of the check is an oxygen-breathing, real live human being who is not the figment of anyone's imagination. Completed

13

check for $10,001 in hand, the outbound traveler would not have any reason whatsoever to believe there was a legal obligation to report that check. While the Constitution may not prohibit confusion, it does prohibit its criminalization.

To be sure, some of these same problems can arise even under the plain language definition of "fictitious payee" used by the Court in this case. For, again, holding what appears on its face to be an unreportable check because it is fully completed may, in fact, unbeknownst to the traveler, be a check drawn to the order of an imaginary entity – someone or something which does not exist. The simple truth, nonetheless, obtains-- a "fictitious payee rule" check is not in any practical sense a bearer instrument, which is all the statute and regulation purport to require to be reported. It is a check that can be negotiated only by the fictitious payee or someone in cahoots with him. What the fictitious payee rule does is to treat a check that is not in bearer form as if it were in bearer form solely as a means of protecting anyone paying the check in the ordinary course, usually a bank. In no common sense way is such a check the functional equivalent of cash for the universe outside the partners in fraud, who drew and intended to negotiate it; that other universe cannot practically negotiate such a check. Clearly, that any requirement to report a look-alike non-bearer instrument would be outside a reasonable traveler's understanding was made manifest time and again during the trial through the testimony of a parade of government witnesses. Their testimony of own their understanding of the outbound currency reporting rules that they and their fellow enforcement agents actually use to, in the words of Customs and Border Protection Agent Tara Diaz, "inform the traveling public of the reporting requirements" (Tr. at 622)[12], gave poignant, clear and compelling voice to just how unfair and violative of due process would be any charge against an outbound traveler founded on the failure to report a check drawn to a specific named payee but violative of a "fictitious payee"

---

[12] "Tr." refers to the transcript of the trial proceedings.

rule:

> Special Agent Bryant Wong of the Department of Immigration and Customs Enforcement:
>
> > Q   And you make no distinction between negotiable instrument[s] and bearer negotiable instruments?
> > A.   Negotiable instruments, they're just negotiable. If you can pick it up off the floor and bring it to the bank and cash it, it is negotiable.

(Tr. at 306-307).

> Agent Joseph Lestrange, former Senior Special Agent in the Currency and Financial Investigations Division of the Department of Immigration and Customs Enforcement at JFK International Airport:
>
> > Q.   I want to get one thing straight about your understanding of what these monetary instruments are, the ones that must be recorded at the airport. Would it be fair to say –
> > THE COURT: Vis-à-vis outbound.
> > Q.   Outbound currency reporting requirements. Would it be fair to say that they have to sort of be the functional eequivalent of cash?
> > A.   Yes.
> > Q.   As a matter of fact, they have to be something, so that if I had it in my hand and passed it along to anybody in this courtroom, they could just take it to a bank and cash it; is that correct?
> > A.   That's one of the requirements, yes.

(Tr. 130-131).

> Department of Immigration and Customs Enforcement Customs and Border Protection Officer Ajay Lall:
>
> > Q.   Inspector Lall, why did you seize those five checks?
> > A.   As far as CBP regulations were concerned, they are negotiable monetary instruments.
> > Q.   What made them negotiable?
> > A.   They were endorsed.
> > Q.   The fact that there was writing on the back means that they were endorsed?
> > A.   Correct.
> > Q.   Does any kind of writing on the back of a check constitute an endorsement?
> > A.   No.

15

> Q. Did you ever have any training as to what was an endorsement?
> A. Yes.
> Q. What is an endorsement?
> A. I don't understand the question.
> Q. Well, what is an endorsement on the back of a check?
> A. When the signature of the person... is on the check, the way he could go into a bank and actually cash it.

(Tr. at 706-707).

Special Agent Robert Turner, of the Department of Immigration and Customs Enforcement:

> Q. [I]f Abdo Zokari or someone wrote Abdo Zokari's name on the back as an endorsement and then that check got lost, anyone could pick it up and cash it; is that right?
> A. That's correct.
> Q. And that's the theory behind why these things have to be reported in the first place?
> A. Yes, ma'am.

(Tr. at 851).

Not only are the words of the regulation ambiguous, the government's message to the outbound traveler is downright misleading. No one, other than the schemers involved in the fraud, could pick up a "fictitious payee" check off the airport terminal floor and believe it negotiable by them or that it was the functional equivalent of cash. With such genuine ambiguity and misdirection, as the Supreme Court noted recently, fair warning demands that "the tie must go to the defendant." Santos, 128 S.Ct. at 2025.

There should be no mistake, however, as to the Court's actual determination: Rules of statutory construction commanded an interpretation of the words "fictitious payee" used in the implementing regulation that excluded the checks proffered by the government as checks drawn to a fictitious payee. But, even in the absence of such a ruling, the Court observes that the principles of fair warning would have served to exclude the "fictitious payee" checks as proffered by the government. Indeed, as the statute and regulation are drafted, the Court is

16

highly dubious that a prosecution for violation of the monetary instrument exportation reporting requirements can ever be maintained based on the alleged failure to report a fully completed check drawn to a "fictitious payee", whether defined by plain American language or as derived from the Uniform Commercial Code, consistent with due process principles of fair warning and the rule of lenity.

## CONCLUSION

For the foregoing reasons and those expressed on the record in open court, the Court denied the defense motion on the money transmission business charges to exclude checks which were not issued in exchange for cash and granted the defense motion to exclude the proffered "fictitious payee" checks, that is, completed checks made out to a specific, existing named payee but to be negotiated by or on behalf of another individual, for the purpose of proving the monetary reporting evasion counts.

SO ORDERED.

Dated: Brooklyn, New York
June 24, 2008

s/ENV
_____
ERIC N. VITALIANO
United States District Judge