UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------ x
UNITED STATES OF AMERICA       :

      :               OPINION AND ORDER

   -against-          :

      :               06-CR-200 (ENV)

HAMAD ALI,      :

HAMOOD ZOKARI,      :

ISADORE A. USEROWITZ,      :

HAROLD WEISBERG and      :

MOHSEN HUDYIH,      :

      :

                Defendants.   x
------------------------------------------------------------------

**VITALIANO, D.J.**

     Defendants Hamad Ali, Hamood Zokari, Isadore Userowitz, Harold Weisberg and

Mohsen Hudyih were the first of an even larger cast in this case to go to trial on the superseding

indictment's charges of operating, and conspiring to operate, an unlicensed money transmitting

business and the evasion of, and conspiracy to evade, monetary instrument exportation reporting

requirements. Hamood Zokari was ultimately convicted of the counts related to monetary

reporting, but acquitted by the jury of the money transmitting charges. The remaining first-group

defendants were acquitted of all charges. Hamood Zokari renews his motion to dismiss the

indictment or, in the alternative, for a judgment of acquittal or, failing that, a new trial all under

Rules 29 or 33 of the Federal Rules of Criminal Procedure. Separately, Ali, Userowitz and

Weisberg move for an award of attorney's fees and expenses under the Hyde Amendment, 18

U.S.C. § 3006A, alleging that the prosecution against them was "vexatious, frivolous, or in bad

faith." For the reasons that follow, all motions are denied.

## BACKGROUND

In March 2006, a grand jury returned a six-count indictment charging Hamood Zokari and others with operating and conspiring to operate unlicensed money transmitting businesses in violation of 18 U.S.C. §§ 371 and 1960(a), evading and conspiring to evade international monetary reporting requirements in violation of 31 U.S.C. §§ 5316 and 5324 and, in the case of Ali, Hamood Zokari, Abdullah Alhababi and others not tried in the first group, with conspiracy to collect extensions of credit through extortionate means in violation of 18 U.S.C. § 894.

Alhababi moved to dismiss the extortionate collection counts against him. The Court granted the Alhababi motion on August 15, 2007. United States v. Kramer, 499 F.Supp.2d 300 (E.D.N.Y. 2007). A superseding indictment followed, omitting the extortionate credit counts in their entirety and amending the overt acts alleged in the conspiracy counts.

Checks issued by various defendants and other entities were foundational evidence common to all charges. The issue of whether certain of the checks were "monetary instruments" covered by the reporting statutes, initially noted by the Court as a source of concern at the time of the Alhababi dismissal, bubbled further in the stew of pretrial evidentiary motions. Defendants, for example, moved to preclude a number of checks drawn to and negotiated by the named payees. The government conceded early that these checks were not covered monetary instruments, and thus not relevant to the actual evasion count, but argued that such checks nonetheless were evidence of a conspiracy to evade the monetary requirements because additional evidence suggested that the defendants thought they were, in fact, moving reportable instruments. Defendants' ignorance of the law notwithstanding, their "agreement" to engage in lawful conduct was not evidence of a plan to engage in unlawful conduct. The Court ruled, as a result, that the subject checks were inadmissible as proof of a conspiracy to evade the reporting requirements. United States v. Ali, 561 F.Supp.2d 265 (E.D.N.Y. 2008).

2

What remained to prove the crimes charged in the indictment could be grouped as

follows:

- Wiretap conversations from the telephones of former defendant Neil Kramer, Ali and Hamood Zokari, frequently concerning the movement of checks (which prompted several border searches).

- Checks in various stages of completion seized or photocopied as a result of the border searches. Among these were:

  o Checks the government claimed were checks "made payable to a fictitious payee", that is, completed checks made out to a specific named payee, who existed but whom the government contended was "fictitious" because the payee was not the intended recipient of the proceeds of the check. Finding that such checks did not satisfy the definition of checks embraced by the regulations implementing the monetary instrument reporting statute, the Court ruled such checks inadmissible as to the reporting counts, but admissible on the money transmitting business counts. <u>United States v. Ali</u>, 561 F.Supp.2d 269 (E.D.N.Y. 2008).[1]

  o Checks found by inspectors during a wiretap-prompted examination on December 1, 2005 at John F. Kennedy International Airport. Law enforcement officials testified that they discovered several checks in luggage ticketed to defendant Abdo Zokari and bearing his brother Hamood Zokari's nametag, including 1) eight checks drawn on Ali's

---

[1] The Court made its ruling concerning the "fictitious payee" checks prior to the conclusion of the evidence-taking. The Court also drafted a limiting instruction for the jury that categorized the proffered checks and explained which checks could be considered relevant for which counts. The defense did not object to this proposal, or to its format, length or complexity.

corporate bank account and issued to designated payees, including three
made out to Abdo Zokari (in the amounts of $8000, $8000 and $9000) and
three others totaling $2,685.50 that were already endorsed by the payee; 2)
seven unendorsed checks issued by Kramer to Abdo Zokari in amounts
ranging from $5000 to $9000; 3) ten checks from the checking account of
Mohammed Khubani, one of the yet-to-be-tried defendants, with
Khubani's signature as drawer but the payee and amount areas left blank
(these checks were ultimately completed and cashed in Yemen for
$42,100); 4) seven signed checks with the payee and amount left blank
from "1766 2nd Ave, Deli Grocery Inc" that, bank records suggest, were
completed and cashed in Yemen for a total of $15,000 and 5) two books of
bank checks from former defendant Saeed Zokari's account, signed by
Saeed Zokari with the payee and amount areas left blank.

- Bank records from defendants Userowitz and Weisberg showing that each had
  issued checks in amounts of $10,000 or less that were, bank records suggested,
  ultimately cashed in Yemen.

- Trial testimony from cooperating witness Kramer, who had previously pled guilty
  to the count charging him with operating an unlicensed money transmitting
  business. Kramer testified that he had provided certain of his Yemeni customers
  with loans, and was directed by Ali and Hamood Zokari to split the loan amounts
  into checks of $10,000 or less and to make them payable to third parties.

- A post-arrest statement from Ali in which he acknowledged sending money
  overseas for friends and family and explained that the checks were broken down
  into sums smaller than $10,000 apiece in order to avoid reporting them to the

4

government, which seemed to be confirmed by ledgers belonging to Ali.

At the close of the government's case, all defendants, of course, moved pursuant to Rule 29 of the Federal Rules of Criminal Procedure for a judgment of acquittal. The Court reserved decision. A limited defense case followed. At the close of the entire case, the Rule 29 motions were renewed and decision again reserved. When the case was finally submitted to the jury, it was submitted with a special jury instruction and interrogatory related to 31 U.S.C. § 5324. That section of law specifies three distinct methods by which defendants could have violated the reporting requirements: (1) by failing to file a required report, (2) by filing a false or misleading report or (3) by committing structuring in order to evade reporting requirements. The jury was asked to specify by which, if any, of the three alleged methods the government had proved, separately as to each defendant, there had been a violation of 31 U.S.C. § 5324. The special jury instruction, in its final form, was not the subject of an objection by any party as to its length or format.

After four days of deliberations, the jury acquitted Ali, Userowitz, Weisberg and Hudyih of all charges. The jury also acquitted Hamood Zokari of conspiracy to operate an unlicensed money transmitting business and the substantive underlying count of operating such a business, but convicted him of conspiracy and substantive violation of the international monetary reporting requirements. The jury indicated further on the special verdict sheet that Hamood Zokari was guilty as to all three liability theories under 31 U.S.C. § 5324 set forth in the indictment, but concluded that the government had failed to prove structuring that involved a pattern of illegal activity involving more than $100,000 in a one year period. The statute's sentencing enhancement provision, therefore, does not apply.

Hamood Zokari anchors his post-conviction motion in three main arguments. The first is a constitutional argument: the currency reporting statutes and implementing regulations fail to

5

give sufficient warning as to what conduct is prohibited, thus running afoul of the Fifth

Amendment to the Constitution. The second basis for the motion is factual: the evidence at trial

did not support a finding of the defendant's guilt beyond a reasonable doubt. The third is

fairness: the wholesale admission of evidence subject to a connection that the government never

made resulted in the denial of a fair trial. On a different tack, prevailing defendants Ali,

Userowitz and Weisberg seek an award of attorney's fees and expenses under the Hyde

Amendment, asserting that such recovery is warranted because they were the victims of a bad-

faith prosecution.[2]

    I.    <u>Hamood Zokari's Motion</u>

        a.  The Constitutional Challenges

Zokari argues that the Court should find the reporting requirement statutes

unconstitutionally vague or, failing that, to dismiss the monetary reporting charges under the rule

of lenity. His argument is sown in unassailable ground – fundamental principles of

constitutional fair warning mandate "that no individual be forced to speculate, at peril of

indictment, whether his conduct is prohibited." <u>Dunn v. United States</u>, 442 U.S. 100, 112, 99

S.Ct. 2190, 2197, 60 L.Ed.2d 743 (1979). These principles take concrete form in distinct but

interrelated ways that the Supreme Court has discussed at length:

> There are three related manifestations of the fair warning requirement. First, the
> vagueness doctrine bars enforcement of "a statute which either forbids or requires the
> doing of an act in terms so vague that men of common intelligence must necessarily
> guess at its meaning and differ as to its application." Second, as a sort of "junior version
> of the vagueness doctrine," the canon of strict construction of criminal statutes, or rule of
> lenity, ensures fair warning by so resolving ambiguity in a criminal statute as to apply it
> only to conduct clearly covered. Third, although clarity at the requisite level may be
> supplied by judicial gloss on an otherwise uncertain statute, due process bars courts from
> applying a novel construction of a criminal statute to conduct that neither the statute nor
> any prior judicial decision has fairly disclosed to be within its scope. In each of these
> guises, the touchstone is whether the statute, either standing alone or as construed, made

---

[2] No such motion was advanced on behalf of prevailing defendant Hudyih, who was represented
by counsel appointed under the Criminal Justice Act.

6

it reasonably clear at the relevant time that the defendant's conduct was criminal. United States v. Lanier, 520 U.S. 259, 266-67, 117 S.Ct. 1219, 1225 (1997) (citations omitted). The distinctions between these offshoots of the same constitutional principle create the nitty-gritty of their varied requirements, while sharing the essential core. Success on any one analytical path spares Zokari conviction.

Determining whether a statute is void for vagueness is a process consisting of two recognized steps: (1) determining whether the statute in question "defines criminal conduct precisely enough that ordinary people can comprehend what conduct is proscribed." United States v. Cullen, 499 F.3d 157, 163 (2d Cir. 2007) (citations omitted), and (2) a showing that the statute establishes "minimal guidelines to govern law enforcement" so that police, prosecutors and juries may not pursue their own personal preferences. Id. Meanwhile, rule of lenity considerations are activated only "when a court after looking at all aids to legislative meaning can no more than guess as to what Congress intended." Id. Where such an ambiguity exists, the rule of lenity "requires that... a court should resolve [the] ambiguity in favor of the defendant." United States v. Polizzi, No. 06-CR-22 (JBW), 2008 WL 877164 at *62 (E.D.N.Y. Apr. 1, 2008)[3]

Zokari cites several pockets of alleged ambiguity that, he claims, are fatal to the charges of conviction. First among these is alleged vagueness in the universe of instruments subject to the reporting requirements. Under 31 U.S.C. 5316(a)(1), persons who transport cash or certain kinds of monetary instruments of more than $10,000 from a place inside the United States to a place outside the United States are required to fill out a form listing, among other things, the amount and kind of monetary instruments being transported, their owner and their destination.

---

[3] Zokari does not press a "novel construction" argument, the third fair warning manifestation outlined in Lanier. Regardless, had he, it would appear to be subsumed by the breadth of his overall lenity argument.

"Monetary instruments" are defined by the applicable regulation to include the following:

> (i) Currency;
> (ii) Traveler's checks in any form;
> (iii) All negotiable instruments (including personal checks, business checks, official bank checks, cashier's checks, third-party checks, promissory notes (as that term is defined in the Uniform Commercial Code), and money orders) that are either in bearer form, endorsed without restriction, made out to a fictitious payee (for the purposes of § 103.23), or otherwise in such form that title thereto passes upon delivery;
> (iv) Incomplete instruments (including personal checks, business checks, official bank checks, cashier's checks, third-party checks, promissory notes (as that term is defined in the Uniform Commercial Code), and money orders) signed but with the payee's name omitted; and
> (v) Securities or stock in bearer form or otherwise in such form that title thereto passes upon delivery.

31 C.F.R. § 103.11(u)(1). Zokari specifically claims that section (iv) is not clearly applicable to those checks that were found by agents with signatures but without filled-in amounts or payees and, if they are, then cannot be so applied constitutionally.

The Court disagrees. Simply put, although 31 C.F.R. § 103.11(u)(1)(iv) does not specifically list "checks that only bear signatures" within its enumeration of monetary instruments, such checks would appear to be a clear subset of the instruments that are listed in (iv). What is critical is that the instrument is signed by the drawer and whatever incompleteness presented includes the omission of a named payee. That the regulations do not endeavor to distinguish between the resulting universe of incomplete checks – those with amounts filled in and those without – does not necessarily lead one to find an unacceptable ambiguity any more than a statute that prohibits car theft but fails affirmatively to distinguish between American and Japanese made cars would be unacceptably ambiguous.[4]

---

[4] Zokari argues that the definition of "monetary instrument" in 31 U.S.C. 5312(3)(b) is impermissibly vague. That statute simply gives the Secretary the power to further define the scope of that term through the implementation of regulations such as 31 C.F.R. § 103.11. To the extent that this statute represents an incomplete definition of "monetary instrument", the

However, Zokari astutely notes a conundrum: factoring the regulator's reach to include incomplete checks with unascribed value must be reconciled with 31 U.S.C. 5316's requirement that a report be filed where "monetary instruments of more than $10,000 at one time" are transported. The Court agrees that checks drawn in blank amount cannot contribute to the *amount* triggering a reporting obligation as such covered instruments leave the country. Although technically covered "monetary instruments", they are monetary instruments with no value at the critical point of valuation – upon their exportation from the United States. Nevertheless, as the government notes, multiple theories of liability under the reporting statute are available. Specifically, the statute bars the following conduct:

> **(c) International monetary instrument transactions.**--No person shall, for the purpose of evading the reporting requirements of section 5316--
> **(1)** fail to file a report required by section 5316, or cause or attempt to cause a person to fail to file such a report;
> **(2)** file or cause or attempt to cause a person to file a report required under section 5316 that contains a material omission or misstatement of fact; or
> **(3)** *structure or assist in structuring, or attempt to structure or assist in structuring, any importation or exportation of monetary instruments.*

31 U.S.C. 5324 (emphasis added). The government maintains that the third enumerated mechanism of liability, the structuring component, covers precisely the conduct alleged with respect to the signed but otherwise blank checks and, in fact, was a basis of Zokari's conviction. Zokari responds that the definition of structuring is either implemented in overtly conflicting fashion or simply is insufficiently spelled out for the ordinary citizen to understand. The Court rejects each of these arguments as well.

The argument that the regulations contradict themselves relies on the observation that the regulation implementing the anti-structuring rule, 31 C.F.R. 103.11(gg), refers to transactions in

---

regulations it spawned serve as the cure. Cf. Casillas v. Daines, 2008 WL 3157825 (S.D.N.Y. Aug. 5, 2008) (citing Golden State Transit Corp. v. City of Los Angeles, 493 U.S. 103, 110 S.Ct. 444 U.S. (1989) (noting that courts can look to regulations promulgated under a statute and, based upon those regulations, concluding that the statute does not create a vague and amorphous standard).

currency, and that 31 C.F.R. 103.11(ii) excludes checks from its definition of currency. Because both of these provisions, by their own terms, refer <u>solely</u> to the reporting requirements of 31 C.F.R. § 103.22, a part that sets forth rules of reporting for certain financial institutions and has nothing to do with the reporting requirements for individual travelers, this argument is far out of bounds. Pressing on, Zokari argues that, fatal to conviction, no definition of structuring a transaction exists within the statute or its implementing regulations. Although the absence of a fully developed definition of "structuring" may seem a red flag, the flag is only yellow instead, prompting simply a pause for an exercise in statutory interpretation.

Circuit law counsels that such statutory interpretation begins with an examination of the plain language to be construed; where it is unambiguous, the interpretive process also ends there. <u>See</u> <u>Puello v. Bureau of Citizenship and Immigration Services</u>, 511 F.3d 324, 327 (2d Cir. 2007) (citing <u>Collazos v. United States</u>, 368 F.3d 190, 196 (2d Cir. 2004)). The process of ascertaining the "plain meaning" of a statute or regulation obviously includes an analysis of the particular language at issue, but it also implicates the language and design of the statute or regulation as a whole. <u>Id</u>. Presented here is something other than an impermissible void, as the word "structuring" has a plain meaning. Although the ordinary dictionary definition of "structuring" – "to construct or arrange according to a plan; give an organization to," THE NEW OXFORD AMERICAN DICTIONARY 1689 (2001) – may create a broad array of prohibited conduct, that breadth should not be confused with constitutionally impermissible vagueness. The ordinary citizen who is otherwise aware of the monetary requirements and the prohibition against structuring would know not to arrange or organize covered instruments intentionally so as to avoid reporting them when exporting or importing them. Stated another way, the hypothetical "ordinary person" can put the pieces together at this point. The statute bars the structuring (or arranging) of covered monetary instruments (which include the signed and otherwise blank

10

checks) for the purpose of evading the monetary requirements. The use of signed but blank checks to be completed and cashed overseas would clearly fulfill that evasive purpose. The crime is not that the checks were in blank amount and went unreported when they should have been. The crime is that the checks were sent in blank amount (and were therefore not reportable at the time of export) but were left blank intentionally as part of a scheme to avoid reporting. The Court finds no vagueness defect as to the structuring charges.[5]

Zokari's remaining arguments as to vagueness touch upon the fictitious payee checks. The Court's frustration with the inartful drafting of the statute and its regulations in this regard has been well chronicled. The Court noted in an earlier opinion "just how unfair and violative of due process would be any charge against an outbound traveler founded on the failure to report a check drawn to a specific named payee but violative of the so-called 'fictitious payee' rule." Ali, 561 F.Supp.2d at 278. But in so doing, the Court also held that none of the checks at issue in this case were, in fact, "fictitious payee" checks. Id. at 276. Given the absence of submission of a single "fictitious payee" check, as the Court defined the term, for the jury's consideration on the counts of conviction, this argument is academic.

Lastly, Zokari's vagueness arguments fail to address alleged conduct that would separately support the jury's finding of criminal liability. In addition to the signed blank checks, which are probative only of structuring, Zokari was found with checks complete except as to a payee totaling $8600 on his person and more than $2600 in his luggage – luggage that,

---

[5] Zokari also argued that 31 U.S.C. 5324(c) is void for vagueness because, under the standards of United States v. Phipps, 81 F.3d 1056 (11th Cir. 1996), "report required" means a report the defendant is required to file, not would be required to file if circumstances were different, i.e., if the incomplete checks had amounts filled in). This misses the point of the structuring statute. Even if the check amounts ultimately cashed overseas are such that they made the checks reportable if they had left the country with the cash amount filled in, they were not offered to prove that these checks should have been reported. Rather, these checks were offered to prove the structuring machinations that occurred in order to deliberately evade the reporting requirements. The scheme itself is the crime, not the failure to report any of these kinds of instruments individually or collectively.

11

unbeknownst to him at the time, had been inspected and its contents logged. Upon being stopped and presented with a Customs form alerting him to the $10,000 reporting threshold, Zokari reported only the $8600 on his person. No one disputes that the checks totaling $2600 plus were covered instruments, merely whether the amount was, in fact, chargeable to Hamood Zokari. While Zokari might factually dispute that the entire $11,000 plus in covered monetary instruments was chargeable to him, there can be no reasonable dispute that the statute criminalizing the failure to report such an exportation is not subject to constitutional challenge on vagueness grounds.

"A plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others. A court should therefore examine the complainant's conduct before analyzing other hypothetical applications of the law." Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 495, 102 S.Ct. 1186, 1191 (1982); see also Farrell v. Burke, 449 F.3d 470, 485 (2d Cir.2006). "To succeed [in a challenge for facial vagueness], the complainant must demonstrate that the law is impermissibly vague in all of its applications." Id. at 497. As troubling as the fictitious payee component of the statute may be, the Court's prior ruling and limiting instruction and Zokari's alleged conduct involving other instruments unrelated to fictitious payee checks or incomplete checks payable in blank amount consign these complaints to the realm of the irrelevant on his motion.

Having not found criminal conduct so poorly defined that an ordinary person could not have understood, the Court rejects Zokari's vagueness challenge. The rule of lenity challenge fails for related reasons. Zokari contends that the definition of what checks were and were not reportable was sufficiently vague to invoke the rule of lenity, and that the checks were not, in fact, reportable. The Court, however, has consistently made rulings to limit the reach of the statute to avoid lenity concerns and, indeed, has agreed that the incomplete checks about which

he principally complains were not reportable though admissible to prove structuring. Moreover, even assigning merit to Zokari's claim for argument's sake, evidence of sufficient unambiguously covered conduct was proven and supports a conviction. The Court, therefore, denies Zokari's rule of lenity challenge too.

### b. Zokari's Challenge to the Limiting Instruction

On another score, Zokari argues that a substantial amount of evidence, especially related to the proffered "fictitious payee" checks, was presented to the jury but was ultimately ruled irrelevant to the counts of conviction. It is true that all checks received in evidence were received "subject to connection". It is also true that, particularly with respect to the counts of conviction, the connection never came. As a result, the Court gave the jury a robust curative instruction with respect to each check and any extrinsic evidence relating to it as to whether the jury could consider such evidence for the monetary reporting counts, the money transmitting counts, or both categories. Zokari claims this instruction was confusing and that the volume of this evidence admitted created irremediable prejudice against him.

The Court notes at the outset the "the almost invariable assumption of the law that jurors follow their instructions." Richardson v. March, 481 U.S. 200, 206 (1987). That assumption can "evaporate... where there is an overwhelming probability that the jury will be unable to follow" a limiting instruction that demands "mental acrobatics" of the jurors. United States v. Jones, 16 F.3d 487, 493 (2d Cir.1994). The detailed limiting instruction – which Zokari did not object to as confusing either prior to or after its delivery to the jury – grouped the checks into three distinct and clearly articulated categories. The instruction also reminded jurors that the evidentiary limitations themselves had no value with respect to the weight and credibility of evidence, and that the limiting instructions provided with respect to individual checks or classes of checks applied with equal force to transcripts or testimony about those checks. The jurors were given a

13

copy of the instruction for use in their deliberations.

Zokari provides no specific reason beyond naked assertion that the instructions were confusing. Although the Court acknowledges that the weeks of testimony, different categories of evidence and multiple defendants created a challenging atmosphere for trial generally, there has been no showing whatsoever of the "overwhelming probability" of the nigh insurmountable complexity and mystification that the law demands for relief. If anything, the verdict returned – acquittal of the other defendants on all charges and of Zokari on the money transmitting charges with conviction for Zokari on the reporting-related charges but not on the aggravated structuring charges – is a sufficiently cogent and nuanced result as to suggest strongly that the jury did not throw up its hands in frustration and surrender. See United States v. Naiman, 211 F.3d 40, 50 (2d Cir. 2000) (inference from form of verdict that jury "appears to have sorted through the voluminous evidence and arrived at a rational decision"). Impossible mental acrobatics seemed not to be on display in the jury room so much as an admittedly vigorous, but reasonable, mental workout. The Court, therefore, sees no reason to conclude that the jury was unable to follow or departed from its instructions. Zokari's claims that he was prejudiced by the instructions or the volume of evidence the Court (properly) admitted on, and limited to, the charges of which he was acquitted are meritless.

### c. Zokari's Challenge to the Sufficiency of the Evidence

Zokari also claims that the evidence presented by the government was insufficient to sustain a conviction on the reporting counts.

A defendant challenging a conviction on the basis of insufficient evidence bears a particularly heavy burden. United States v. Thomas, 377 F.3d 232, 237 (2d Cir.2004); United States v. Tocco, 135 F.3d 116, 123 (2d Cir.1998); United States v. Russo, 74 F.3d 1383, 1395 (2d Cir.1996). Chief among the mammoth hurdles facing such a defendant is that the evidence

must be viewed in the light most favorable to the government and all permissible inferences must be drawn in its favor. See United States v. Irving, 452 F.3d 110, 117 (2d Cir. 2006); United States v. Jones, 393 F.3d 107, 111 (2d Cir. 2004); see also United States v. Casamento, 887 F.2d 1141, 1156 (2d Cir.1989). A court also must defer to the jury's resolution of witness credibility and, where there is conflicting testimony, to its selection between competing inferences. Tocco, 135 F.3d at 123; see also United States v. Pelaes, 790 F.2d 254, 259 (2d Cir.1986). A conviction must be sustained if "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); United States v. Desimone, 119 F.3d 217, 223 (2d Cir.1997). Further, the elements of the crimes charged may be established entirely by circumstantial evidence. See United States v. Sureff, 15 F.3d 225, 228 (2d Cir.1994). Also, the court must consider the evidence in its totality, and not in isolation. United States v. Rosenthal, 9 F.3d 1016, 1024 (2d Cir. 1993).

The trial court does have broader discretion to grant a new trial under Rule 33 than to grant a motion for acquittal under Rule 29. Nevertheless, it is a tool to be employed only "sparingly" and in "the most extraordinary circumstances." United States v. Sanchez, 969 F.2d 1409, 1413 (2d Cir. 1992). The district court must strike a balance between weighing the evidence and credibility of witnesses and not "wholly usurp[ing]" the role of the jury. United States v. Autuori, 212 F.3d 105, 120 (2d Cir.2000). The rule itself states that "the court may grant a new trial to [a] defendant if the interests of justice so require." Fed. R. Crim. P. 33. The crucial question is whether "letting a guilty verdict stand would be a manifest injustice." Id. The Court must find that "competent, satisfactory and sufficient evidence" supports the jury verdict in order to deny such a motion.

The evidence in this case is that Hamood Zokari did not fill out a reporting form

15

indicating that he was carrying over $10,000 when he and his brother Abdo, also known as

Abdul Jalil, were stopped in JFK Airport. Among the government's translated wiretap

conversations of Zokari prior to this point was one in which he told an individual that his trip

would be made possible with the presence of his brother:

> MUSA: With Abdul Jalil... you don't have to carry anything.
> HAMOOD ZOKARI: Yes... with Abdul Jalil; is possible... because, Abdul Jalil is
> different and I am different... I'm just traveling along with him!

(Gov. Exh. 23T). Testimony from Agent Tara Diaz and Special Agent Robert Turner indicated

that the defendant's luggage contained, among other monetary instruments, three reportable

instruments totaling $2685.50. (Gov't Exh. 58). Federal agents testified that, upon being

stopped and questioned by them, Zokari only told them of the $8600 on his person, without

mentioning the instruments in his luggage. (Tr. at 653-657). He signed a Customs form

confirming only the $8600 on his person. Id. The other monetary instruments in Zokari's

luggage included the Mohammed Khubani checks, with Khubani's signature included but the

payee left blank. (Gov't Exh. 56). Bank records indicated that these checks were ultimately

cashed in Yemen for a total of $42,100 over a period beginning in 2005. (Gov't Exh. 57).

Applying the well-established case law, the Court sees more than sufficient evidence in

the trial record to support Hamood Zokari's conviction on the two monetary reporting counts.

Assuming the jury found that the monetary instruments in the luggage were, in fact, Hamood's

rather than Abdo's – a permissible finding, given that the luggage, though ticketed in Abdo's

name, bore Hamood's nametag -- a reasonable jury could have found Zokari guilty under any of

the three theories of liability on the reporting count, that is (a) the failure to fill out a form

reporting covered instruments amounting to more than $10,000, (b) his alleged false written

statement as to the amount he was carrying out of the United States in response to the federal

agents' forced stop and (c) the multiplicity of covered instruments the jury could have considered

for structuring, including the signed-but-otherwise blank Khubani checks arranged in such a way so as to be completed and negotiated overseas in a total amount over $10,000 as part of a scheme to circumvent the reporting requirements. Therefore, in light of sufficient evidence to support conviction on the counts Zokari was convicted of and in the absence of extraordinary circumstances to the contrary, Zokari's motion both pursuant to Rule 29 and Rule 33 of the Federal Rules of Criminal Procedure must be, and hereby is, denied.

II.     The Hyde Amendment

Defendants Ali, Userowitz and Weisberg's claims come pursuant to the Hyde

Amendment, which provides:

> During fiscal year 1998 and in any fiscal year thereafter, the court, in any criminal case (other than a case in which the defendant is represented by assigned counsel paid for by the public) pending on or after the date of the enactment of this Act [Nov. 26, 1997], may award to a prevailing party, other than the United States, a reasonable attorney's fee and other litigation expenses, where the court finds that the position of the United States was vexatious, frivolous, or in bad faith, unless the court finds that special circumstances make such an award unjust. Such awards shall be granted pursuant to the procedures and limitations (but not the burden of proof) provided for an award under section 2412 of title 28, United States Code. To determine whether or not to award fees and costs under this section, the court, for good cause shown, may receive evidence ex parte and in camera (which shall include the submission of classified evidence or evidence that reveals or might reveal the identity of an informant or undercover agent or matters occurring before a grand jury) and evidence or testimony so received shall be kept under seal. Fees and other expenses awarded under this provision to a party shall be paid by the agency over which the party prevails from any funds made available to the agency by appropriation. No new appropriations shall be made as a result of this provision.

Pub.L. No. 105-119, § 617, 111 Stat. 2440, 2519. Neither the statute nor its supporting notes provide a precise definition of "vexatious, frivolous, or in bad faith." The Second Circuit, while declining to parse the precise meaning of these terms, has observed that the plain meaning of each phrase as defined by dictionaries aligns with its rulings on the subject to date. United States v. Schneider, 395 F.3d 78, 86 (2d Cir. 2005), cert denied Schneider v. United States, 544 U.S. 1062 (2005). With due deference, the Court applies the following circuit precedent:

The Sixth Edition of *Black's,* which was the current edition at the time of the Hyde Amendment's passage, defines the word "vexatious" as "[w]ithout reasonable or probable cause or excuse." *Black's Law Dictionary* 1565 (6th ed.1990). The third edition of *Webster's* defines "vexatious" as "causing or likely to cause vexation," or "lacking justification and intended to harass." *Webster's Third New International Dictionary* 2548 (3d ed.1993). *Black's* defines a "frivolous" pleading as one "clearly insufficient on its face," and a "frivolous" claim as one for which a proponent "can present no rational argument based upon the evidence or law in support of that claim." *Black's Law Dictionary* 668. *Webster's* defines "frivolous" as "of little weight or importance," and "having no basis in law or in fact." *Webster's Third New International Dictionary* 913. "Bad faith" is, according to *Black's,* "not simply bad judgment or negligence, but rather [implying] the conscious doing of a wrong because of dishonest purpose or moral obliquity." *Black's Law Dictionary* 139. The third edition of *Webster's* includes no definition for the term, although the second edition defines it as "[t]reachery under guise of fidelity." *Webster's Second New International Dictionary* 203 (2d ed.1953).

Schneider, 395 F.3d at 86. The Circuit has also made it clear that, "[a]n acquittal, without more, will not lead to a successful Hyde Amendment claim, as it was Congress's intent to 'limit Hyde Amendment awards to cases of affirmative prosecutorial misconduct rather than simply any prosecution which failed.'" Id. at 88.[6]

a. Allegedly Defective Theories of Prosecution

The moving defendants take issue with three positions the government embraced: first, that the so-called "fictitious payee" checks mentioned above were covered by the reporting statute; second, that the defendants were operating an unlicensed money transmitting business and third, that the conduct originally charged against them and ultimately dismissed by the Court as to former defendant Alhababi was, in fact, extortionate conduct.

Though not from the Second Circuit, case law does provide some guidance on the legal postulate underlying the claims advanced by movants. What one might call a "theory-based" argument for damages under the Hyde Amendment, against the backdrop of the definitional

---

[6] Indeed, the words of Congress requiring that any Hyde Amendment award be paid out specifically from the existing appropriation of the offending agency, without "new appropriation", strongly suggests the purpose of the award was not only to compensate its victims but to punish its perpetrators. For this further reason, then, prosecutorial misconduct need be firmly established.

18

requirement that the government "can present no rational argument based upon the evidence or law in support of that claim," would suggest that a criminal defendant claiming a Hyde Amendment grievance must show that the prosecution took a position either "foreclosed by binding precedent or so obviously wrong as to be frivolous." <u>United States v. Manchester Farming Partnership</u>, 315 F.3d 1176, 1183 (9th Cir. 2003). It is case law unhelpful to movants' claims.

First off, the fictitious payee checks theory was not foreclosed by any precedent – in this district, in the circuit, or anywhere else. The precise question of whether the proferred instruments were covered by the statute and its regulations was a matter of first impression in this case. And although the Court found that the statute clearly did not cover the checks at issue, it also recognizes that the government's reliance on an interpretation of the fictitious payee rule of commercial paper was not facially unreasonable in the wake of what can only be described, bluntly, as a miserably crafted rule. The government may have tested the outer bounds of the legal space that remained in the wake of the shoddy drafting of the reporting statute and its "clarifying" regulations, but its aggressive theory cannot be said to have been obviously wrong at the outset. Decidedly, the government's pursuit of the fictitious payee argument was not frivolous and nothing else is suggested that could possibly support a finding of bad faith on this score.

The moving defendants next contend that the government's interpretation of the money transmitting statute was similarly frivolous. The defendants were charged with operating and conspiring to operate a money transmitting business in violation of 18 U.S.C. § 1960, which provides:

> (a) Whoever knowingly conducts, controls, manages, supervises, directs, or owns all or part of an unlicensed money transmitting business, shall be fined in accordance with this title or imprisoned not more than 5 years, or both.
> (b) As used in this section—
> (1) *the term "unlicensed money transmitting business" means a money transmitting business* which affects interstate or foreign commerce in any manner or degree and--

19

**(A)** is operated without an appropriate money transmitting license in a State where such operation is punishable as a misdemeanor or a felony under State law, whether or not the defendant knew that the operation was required to be licensed or that the operation was so punishable;

**(B)** fails to comply with the money transmitting business registration requirements under section 5330 of title 31, United States Code, or regulations prescribed under such section; or

**(C)** otherwise involves the transportation or transmission of funds that are known to the defendant to have been derived from a criminal offense or are intended to be used to promote or support unlawful activity;

**(2)** the term "money transmitting" includes transferring funds on behalf of the public by any and all means including but not limited to transfers within this country or to locations abroad by wire, check, draft, facsimile, or courier; and

**(3)** the term "State" means any State of the United States, the District of Columbia, the Northern Mariana Islands, and any commonwealth, territory, or possession of the United States.

18 U.S.C. § 1960 (emphasis added). That the statute essentially defines the term "money transmitting business" as "money transmitting business" in subsection (b)(1) is among the more glaring problems the statute presents. With the individual terms "money," "transmitting" and "business" all somehow managing to emerge from this definition with no greater degree of clarity, obvious questions jump to the fore: What constitutes a "business"? What sorts of instruments fall within the category of "money," and which do not? What is "transmitting"?

The Court, in determining questions of law raised by defendant Ali as to whether the word "money" was limited only to cash, plumbed the depths of existing case law for further guidance. And, as noted in its June 24, 2008 opinion, the Court found helpful explanation in one of the rare instances in which the Second Circuit has addressed the money transmitting statute. United States v. Ali, 561 F.Supp.2d 269 (E.D.N.Y. 2008). In United States v.Velastegui, the Circuit described a "money transmitting business" as one that

> receives money from a customer and then, for a fee paid by the customer, transmits that money to a recipient in a place that the customer designates, usually a foreign country. After the customer gives the money transmitter an amount to send to the designee, the transmitter notifies the "payer" with whom it has a contractual arrangement in the recipient country. The payer then notifies the designated recipient of the money, and pays the money to the designee at the payer's office. The transmitter then remits to the payer

20

the amount paid to the designee, plus the payer's commission.

United States v. Velastagui, 199 F.3d 590, 592 (2d. Cir. 1999). That a fee paid by the customer to the transmitter and a commission by the transmitter to the payer would be required comports with the commonsense definition of a business. See *Black's Law Dictionary* 192 (7th ed. 1999) (defining "business" as "a commercial enterprise carried on for profit"). The government essentially charged the defendants with concocting a home-grown Yemeni-American version of Western Union, requiring a New York State money transmitting license. Even the showing of a fee by the customer might not prove that. Absent evidence of a commission paid by the transmitter to the payer, the government would have at best shown the creation of a home-grown Yemeni-American UPS, not requiring such a license.

Yet, on the other hand, it is equally true that New York's opaque statutory law was not at all clarified by a developed case law. Velastegui was the only case cited by New York Jurisprudence relative to the money transmitting license requirement. To be sure, the government initially took the position that the statute did not require proof of a fee, a position, since rejected by the Court. But in opposing Hyde Amendment relief, the government forcefully argues that its earlier position was not frivolous or taken in bad faith. The government, in fact, notes that in an earlier case under the same federal statute, United States v. Elfgeeh, 515 F.3d 100 (2d Cir. 2008), the trial court, upon the strength of expert testimony that, under New York State Banking Law, a money transmitting business "need not take in revenue and need not be profitable" in order to run afoul of the licensing requirement, (Gov. Br. at 40), instructed the jury that "business" meant transferring funds on behalf of others "*usually* for a fee or commission, although profitability is not relevant." (Id. (emphasis added)) The government also noted, rather dubiously, that the Velastegui opinion did not appear to constitute a clear holding, on a specifically raised issue, as to the reach of 18 U.S.C. § 1960. (Though it is accurate that

Velastegui came through the back door in dealing only with a rule of lenity dismissal.)

In any event, the unfortunately unhelpful wording of the statute combined with the existence of a prior, recent jury instruction in this district that could be read to obscure the "fee" issue, if not endorse a circuit-approved definition contrary to that of the Velastegui panel, are compelling. The Court finds that movants have failed to demonstrate by a preponderance a level of outright frivolousness or bad faith within the prosecution's theory of the money transmitting business charges that would trigger Hyde Amendment liability.[7]

Finally, the Court turns to the extortionate credit counts that it dismissed against Alhababi. The government rightly notes that the dismissed charges were not against a defendant presently moving for relief. However, this aspect of the prosecution can still be considered as the Court determines whether the prosecution holistically was "frivolous, vexatious or in bad faith." See United States v. Heavrin, 330 F.3d 723, 730 (6th Cir. 2003).

The Court devoted ample space in a previous opinion to an explanation of why the Alhababi prosecution was misguided. See United States v. Kramer, 499 F. Supp. 2d 300, 301, 304-06 (E.D.N.Y. 2007). Of course, "misguided", on the one hand, and "frivolous or vexatious", on the other, are two very different concepts. The Court finds no evidence that the government's espousal of this theory of liability exhibited dishonest or improper motive or an intent to harass. As for accusations of frivolousness, the Court observes that an aggressive adherence to an

---

[7] The former defendants also raise the related question of whether there was sufficient evidence to bring the defendants to trial on the money transmitting business counts given the Court's interpretation of the definition of "money transmitting business". The Court notes that, although the evidence offered in support of these charges – mainly Ali's business ledgers – arguably left a genuine question as to whether it proved the existence of money transmitting business or merely a separate lending operation, the jury's answer to that question (acquittal on each of the money transmitting charges for all defendants) is not sufficient to justify Hyde Amendment relief. Affirmative misconduct – such as deliberately espousing a faulty theory of liability – is of concern here, not simply putting forth an arguably weak and ultimately unsuccessful prosecution. Schneider, 395 F.3d at 88. The latter has happened more than once in our history. Undoubtedly, no matter how unfortunately, it will again. The Hyde Amendment does not reach such circumstances.

ultimately unsuccessful theory is not enough, especially considering that the theory, once revealed as legally wanting by the Court with regard to Alhababi, was abandoned with respect to the remaining defendants. To be sure, it was a theory not without some rational basis, given that the expansive definition of "extortionate means" under 18 U.S.C. § 891(6) suggests a broad swath of conduct that could, with sufficient creativity (and not necessarily malice or active, willful misconduct), be read to include the withholding of travel documents, the conduct essentially alleged under the government's initial theory of criminal liability. This was yet another situation in which, prior to the Court's holding, no court had provided clarification.

The Court, therefore, finds that with respect to this aspect of the prosecution, too, relief under the Hyde Amendment is not warranted.


b. Alleged Bad-Faith Conduct of the Prosecution

Finally, the moving defendants list a number of individual incidents that they claim merit relief under the Hyde Amendment: (1) the allegedly unlawful issuance of a grand jury subpoena to defendant Userowitz's bank because it imposed an obligation of secrecy and nondisclosure not authorized by Rule 6(e) of the Federal Rules of Criminal Procedure, (2) the allegedly false representation to the Court that there were no handwritten notes pertaining to the interviews of certain witnesses, (3) an alleged failure of the government to timely disclose Brady material, and (4) an incident during which case agents' interrogated several trial spectators in the courtroom gallery during a break.

The Court need not resurrect the less pleasant trial moments (within a frequently contentious prosecution) in minute detail for the purposes of resolving this claim. A Hyde Amendment motion is meant to trigger a very specific inquiry, rather than a general referendum on the conduct of the prosecution team in a given case. As the Second Circuit instructs, the

statute

> does not allow an award for any instance of vexatious, frivolous, or bad-faith conduct. An award is allowed only where the court finds that "the position of the United States was vexatious, frivolous, or in bad faith." Pub.L. No. 105-119, § 617, 111 Stat. 2440, 2519 (emphasis added). In so fashioning the statute, Congress intended to reserve liability for abusive conduct that was sufficiently significant to be found to characterize the position of the United States. We can infer that Congress did not intend to allow liability to be imposed for trivial instances of offending conduct. Congress left to the courts to draw the lines as to how serious the vexatious, frivolous, or bad-faith conduct would need to be to so characterize the "position of the United States." To resolve this case, we need not go further than to say there must be substantial or significant vexatious, frivolous, or bad-faith conduct[...].

Schneider, 395 F.3d at 89 (in reference to incidents in which a finding bad faith on the

government's part was wholly possible). Even if these incidents were proven to be motivated by

bad faith on the part of individual attorneys or agents of the government, movants have not

shown, and the Court does not find, how they could be said to characterize the actual *position* of

the government, rather than individual transgressions. Had movants' challenge to the

government's allegedly flawed theories of criminal liability survived the Court's threshold

inquiry into vexatiousness, frivolousness and bad faith, the door of inquiry would have opened to

proof of motivation, including inquiry into the government's day to day conduct of the

prosecution. Absent that, the cataloguing of every instance of intense disagreement between the

parties over the life of an investigation and trial, be it claimed Brady violations or bush league

recess interrogation of the courtroom gallery, contorts the Hyde Amendment into a vehicle for

Monday morning quarterbacking Congress simply did not intend. Because the individual

instances of alleged misconduct listed by the defendants are not founded upon a frivolous or

vexatious theory of liability, the list of horribles, even if true, is an inappropriate basis for relief

under the Hyde Amendment. On this basis as well, the claim for fees and expenses under the

Hyde Amendment is denied.[8]

---

[8] Had the Court found sufficient evidence of a vexatious, frivolous or bad-faith prosecution, the

24

## CONCLUSION

For the foregoing reasons, Hamood Zokari's motion for acquittal, or alternatively a new trial, under Rules 29 and 33 of the Federal Rules of Criminal Procedure is denied and the application of former defendants Ali, Userowitz and Weisberg for fees and expenses under the Hyde Amendment is also denied.[9]

SO ORDERED.

Dated: Brooklyn, New York
October 24, 2008

_____
ERIC N. VITALIANO
United States District Judge

---

Court would have proceeded to take evidence on reasonable attorney's fees and expenses, which movants' papers estimated between $500,000 and $700,000.

[9] Recognizing the possibility that the decision to uphold Hamood Zokari's conviction and the decision to deny Hyde Amendment relief may both be appealed, the Court notes that the Second Circuit does not appear to have addressed the question of whether Hyde Amendment decisions are appealable as civil or criminal matters. A number of circuit courts have ruled that the Hyde Amendment presents a civil matter, but a survey of circuits reveals consensus rather than unanimity. Compare United States v. Robbins, 179 F.3d 1268 (10th Cir. 1999) (Hyde Amendment appeal is a criminal matter governed by Federal Rule of Appellate Procedure 4(b)) with United States v. Braunstein, 281 F.3d 982, (9th Cir. 2002); United States v. Wade, 255 F.3d 833 (D.C. Cir. 2001); In re 1997 Grand Jury, 215 F.3d 430, 46 (4th Cir. 2000); United States v. Truesdale, 211 F.3d 898 (5th Cir. 2000).